IN

# THE SUPREME COURT

OF

## PENNSYLVANIA.

NORTHERN DISTRICT—JULY TERM 1844.

## Manufacturers' and Mechanics' Bank *against* Bank of Pennsylvania.

An absolute deed of conveyance of land with a separate defeasance delivered to the grantor, compose a mortgage; and if the deed be recorded and the defeasance not, it is void as an unrecorded mortgage against subsequent liens; but it is good and effectual as a lien against a subsequent lien creditor who had actual notice of the true state of the case.

Separate judgments against a principal and surety do not extinguish the relation between them. Hence, if, after judgment, the creditors agree for a sufficient consideration to give time to the principal, the surety will be thereby discharged.

A mortgage limited to a trustee, with power to sell for the payment of the debt secured by it, is not a voluntary assignment for the benefit of a creditor or creditors, such as must be recorded within the period prescribed by the statute provided for such a case.

A mortgage imperfectly recorded is ineffectual as a lien against subsequent judgment creditors; but if there be a second mortgage between the first and the judgments in point of time, to whom the proceeds of the mortgaged premises when sold would be paid, and this mortgagor had actual notice of the first mortgage when he took his own, the first mortgage is good as to him, and therefore entitled to have the money appropriated to it.

ERROR to the Common Pleas of *Union* county.

The Manufacturers' and Mechanics' Bank against The President, Directors & Co. of the Bank of Pennsylvania, the West

(335)

Branch Bank at Williamsport, and the Bank of the United States. This was an issue directed by the court to try the right to the proceeds of the sale of the real estate of John H. Cowden.

The claims of the respective parties were founded on the following facts :

On the 24th April 1841, John H. Cowden conveyed the land, the proceeds of the sale of which were the subject of controversy, by an absolute deed, to one of the directors of the Manufacturers' and Mechanics' Bank, for the consideration of $30,000. When this deed was delivered, the following defeasance was given to the grantor :

"1841, April 24.   Deed, John H. Cowden to James Hunt, for three tracts of land, mills and improvements in Lycoming township, Lycoming county, Pennsylvania.

I hereby testify and declare that the above-mentioned conveyance to James Hunt is given for the purpose of securing to the Manufacturers' and Mechanics' Bank of the Northern Liberties in the city of Philadelphia, payment of a certain promissory note drawn by J. G. Boyd in favour of the said Bank, endorsed by the said J. H. Cowden, for $30,000, dated April 16, 1841, and payable six months after date, with the express understanding and agreement that in case the said note shall not be paid at its maturity, that the said James Hunt, his heirs or assigns, shall sell or dispose of the said premises at public sale to the highest and best bidder for the same, giving at least ten days' previous notice of the time of said sale in Williamsport, and apply the purchase money in payment of the said note ; and if any surplus remains, deducting the costs of said sale and interest on the note, to pay the same to the said John H. Cowden.   The payment of the said note being also further secured by the bond and warrant of attorney of the said John G. Boyd and John H. Cowden to the said Bank, for $30,000, dated April 16, 1841, payable six months after date. And upon payment of said note at maturity, the said bond to be cancelled, and the said premises to be reconveyed to the said John H. Cowden, his heirs and assigns for ever, but not otherwise.

JACOB F. HECKLEY,
One of the Directors of the said Bank."

The deed was recorded on the 21st October 1841, but the defeasance was not recorded at all.

The claim of the Bank of Pennsylvania was founded upon the following deed:

" This indenture, made the 4th day of June, in the year of our Lord 1841, between John H. Cowden, of the county of Lycoming, in the State of Pennsylvania, of the one part, and Joseph Trotter, of the city of Philadelphia, Esq., cashier of the Bank of Pennsylvania, of the other part.   Whereas the President, Directors and Company of the Bank of Pennsylvania are the holders of J.

G. Boyd's draft on Boyd & Cleaver for $25,000, dated the 1st day of May 1841, payable six months after date to the order of the said John H. Cowden, which draft has been accepted by the said drawees, and has been endorsed by the said John H. Cowden to the said Bank; and whereas the said John H. Cowden is desirous of securing to the said Bank the payment of the said draft at its maturity, now this indenture witnesseth that the said John H. Cowden, as well in consideration of the premises and of the trust hereinafter declared, as of the sum of $1 lawful money unto him paid by the said Joseph Trotter at the time of the execution hereof, the receipt whereof is hereby acknowledged, hath granted, bargained, sold, released and confirmed, and by these presents doth grant, bargain, sell, release and confirm unto the said Joseph Trotter, his heirs and assigns, all and singular the messuages, lands, tenements, hereditaments and real estate of him, the said John H. Cowden, situate, lying and being in the county of Lycoming aforesaid, as if the same were herein particularly mentioned and described, together with all and singular the rights, liberties, privileges and appurtenances whatever thereunto belonging or appertaining, and the reversions and remainders, rents, issues and profits thereof, and all the estate, right, title, interest, property, claims and demands whatsoever, of him the said John H. Cowden, of, in and to the same, to have and to hold all and singular the hereditaments and premises hereby granted, or mentioned and intended so to be, with the appurtenances unto the said Joseph Trotter, his heirs and assigns, to and for the only proper use and behoof of the said Joseph Trotter, his heirs and assigns for ever; in trust nevertheless, in case default shall be made in payment of the above-mentioned draft at maturity, to sell the premises hereby conveyed at such time or times, and in such parts or parcels, and to such extent as may be requisite, either by public or private sale, and by good and sufficient conveyance and assurances in the law to grant and convey the same to the purchaser or purchasers thereof, freed, released and discharged from all equity of redemption or other estate or interest of the said John H. Cowden, his heirs and assigns, of, in and to the same, or any part thereof, and also discharged from liability on account of the application of the purchase money; and out of the proceeds thereof, after discharging all the expenses and costs attending the execution of the trust, to pay to the President, Directors and Company of the Bank of Pennsylvania, or their assigns, the full amount of the aforesaid draft, or so much money as may remain unpaid and be owing thereon, including all interest which may have accrued thereon, and the residue if any, and the remaining estates unsold, after the payment and discharge of said draft as aforesaid, to pay over and reconvey to the said John H. Cowden, his heirs, executors, administrators and assigns, to and for his and their own proper use and behoof for ever: Provided, however, that if the said draft shall

be paid and taken up at its maturity, or thereafter, before any of the hereby granted premises shall have been sold as aforesaid, then the said trust shall cease and determine, and the said Joseph Trotter, his heirs or assigns, shall at the proper costs and charges of the said John H. Cowden, his heirs or assigns, grant and reconvey all the hereby granted premises unto the said John H. Cowden, his heirs and assigns, as in his and their first and former estate and title therein, immediately prior to the execution thereof. In witness whereof, the said parties to these presents have hereunto interchangeably set their hands and seals, the day and year first herein above written.          JOHN H. COWDEN, [L. S.]"

This deed was recorded on the 8th November 1841.

The Bank of the United States claimed upon a judgment for $2591.35 against John H. Cowden, entered on the 10th May 1841. Of this judgment the West Branch Bank became the beneficial owner; and it appeared that the judgment was obtained upon a note of William Willard, upon which John H. Cowden was an endorser. It also appeared that the Bank had obtained a judgment against William Willard of the same date, and on the 13th October 1841, in relation to it and other judgments against Willard, the Bank entered into the following agreement:

"United States Bank, now for the use of West Branch Bank, *v.* William Willard. No. 35 February term 1841. Judgment May 10th 1841. $2591.38.

It is now agreed that William Willard authorized the prothonotary to enter judgment for the amount of the note in No. 176 of August term 1841, and that he does not appeal from the award in No. 115, of August term 1841, and that all proceedings shall be stayed in all the above judgments one year from this date, provided said Willard pays, on or before the 3d of November next, the amount of all the interest due upon said claims up to the expiration of this stay of proceedings; and as these judgments are asked to create liens as security, said Willard shall notwithstanding be allowed out of the sum all legal and equitable set-offs he now has or may have. It is further agreed that the amount paid as interest by said Willard may be applied to discharge or lessen one or more of the aforesaid judgments, as said Willard may direct.

The set-offs to be presented for adjustment within six months, and said Willard to procure the assent of his endorser Ford & Beebo to this stay of proceeding in the judgment in which they are concerned before the 3d day of November next. If the above and foregoing is objected to by the Board of Directors at their next or second meeting, this agreement to be inoperative, and said Willard to have notice of the same, and to be reinstated as he

now is with all his present rights and privileges in the aforesaid suits and judgments.

WILLIAM WILLARD.
JAMES ARMSTRONG,
Attorney for Bank."

October 13, A. D. 1841.

The Philadelphia Bank claimed on a judgment against John H. Cowden, entered 9th November 1841, for a balance of $6730.40.

J. & R. Elliott claimed on a judgment against John H. Cowden, entered the 15th November 1841, for $1579.15.

The West Branch Bank claimed on a judgment against John H. Cowden for $15,495, entered on the 13th January 1842. There were several other judgments of later date, but enough is stated to exhibit the points made and decided.

The court below was of opinion that the deed to the Manufacturers' and Mechanics' Bank, which was recorded, and the defeasance which accompanied its execution, which was not recorded, were in law a mortgage; and that the omission to record the defeasance with the deed rendered it void as an encumbrance against the real estate of John H. Cowden, and therefore the plantiff was not entitled to recover, although the jury might believe that the Bank of Pennsylvania had actual notice of the real nature of the transaction between the Manufacturers' and Mechanics' Bank and John H. Cowden.

The court was also of opinion that the other lien creditors were entitled to be paid according to the priority of their liens.

*Pleasants* and *Bellas,* for plaintiff in error.
*Greenough* and *Maynard,* for defendants in error.

The opinion of the Court was delivered by

GIBSON, C. J.—The Manufacturers' and Mechanics' Bank, the United States Bank, the Bank of Pennsylvania, the Philadelphia Bank, J. & R. Elliott, and the West Branch Bank, stand as claimants on the fund in court, in the order of priority in which I have named them; and I shall dispose of the objections to their claims in the same order.

The Manufacturers' and Mechanics' Bank claim by a deed which is in form an absolute conveyance to a third person, from whom they have acquired the legal title; but which is proved by a written specification of conditions delivered on the part of the Bank, and by parol evidence, to be a mortgage in trust to secure the payment of a note for $30,000 discounted by the Bank. This deed was not recorded till the lien of the United States Bank and that of the Philadelphia Bank had taken effect. The specification of conditions has not been recorded at all; and hence an argument that the whole is inoperative as a lien, on the principle of *Friedly* v. *Hamilton,* (17 *Serg. & Rawle* 70), in which the absolute part

of a mortgage which had been recorded without the defeasance was postponed, by a strict construction of the recording Acts, to the liens of subsequent creditors. In favour of all but the Bank of Pennsylvania, the objection is decisive, though it has been argued on the other side that a verbal defeasance could not be recorded. What then? This defeasance was not a verbal one; and, if it were, let those who choose to lend on a form of security which is incapable of being made record notice, take the consequences. Better they should suffer than that creditors should be kept at bay by a deceptive appearance given to the ownership of their debtor's property. It might bear an argument, whether a mortgage exhibited to the world as an absolute deed would not be fraudulent even by the 13 Elizabeth. Be that as it may, a mortgage thus imperfectly recorded is void as an unrecorded mortgage against subsequent liens. It was proved, however, that the Bank of Pennsylvania had actual notice of the true state of the case, and the mortgage is consequently good against it, on the principle of *Jaques* v. *Weeks*, (7 *Watts* 261), though it would be inoperative against those who are more remote. Of the influence of this on the result, something will be said in the sequel.

Next in order stands the judgment of the United States Bank, which is impugned on the ground that the Bank had discharged it by giving time to Willard, for whom Cowden, the debtor, was liable as a surety. The facts are, that on the 10th May 1841 judgments were obtained respectively against Willard as the maker, and against Cowden as one of the endorsers of a note discounted by the Bank; and that on the 13th of October following, the West Branch Bank, having become the beneficial owner of the debt, agreed to stay execution on the judgment against Willard for a year, provided he would pay the accruing interest for the whole period on the 3d of November ensuing, and not appeal from a certain award of arbitrators. The interest was not paid, and it is urged that as the agreement was exploded, it is to be considered as if it had not been made. But the Bank had certainly disentitled itself to sue out execution during the three weeks which preceded the default; a short period, to be sure, but not the less decisive for that. Why then was not Cowden, the endorser, released? Because, it is said, he had been fixed, and the relation he had borne to the maker was extinguished, by the judgment against him. *Pole* v. *Ford* (2 *Chitty R.* 125) is certainly to that effect, but in Westminster Hall it stands alone. It is imperfectly reported, and the ground of the decision is indistinctly disclosed; but it seems that the holder, having obtained judgments respectively against the drawer and the acceptor, abandoned a *fieri facias* sued out by him against the latter, and gave him time " by receiving another security from him to pay at a future time." Whether this was the acceptor's own engagement which would operate as an extension of the original credit, or merely a collate-

ral which would not, is not stated; but the court is said to have "determined that the withdrawing the *fieri facias* against the acceptor did not discharge the drawer, and that the rule that giving indulgence without the consent of the drawer discharges such drawer, does not apply after judgment." There is no such rule; for mere indulgence, without an agreement to tie up the holder's hands, has no such effect either before or after judgment; but as a distinction was taken as to time, it is fair to infer that the indulgence was such as would have released the drawer, had it been in time to be set up as a defence to the action against him. No reason is given for the settling effect ascribed to the judgment, and it would be hard to find one. The law of principal and surety is doubtless not indiscriminately applicable to drawers or endorsers and acceptors or makers; for an endorser cannot compel the holder to go, in the first instance, against those for whom he is conditionally liable, as has been held in *Beebe* v. *The West Branch Bank* at the present term. But where the holder has disabled himself by a binding engagement to give time, it is clear and indisputable law that the endorser is discharged. And the reasons for it show that it is immaterial when the disability was incurred. "The rule," says Mr Chitty, "is founded on the principle that the holder, by entering into a binding engagement to give time to the acceptor, renders him less active in endeavouring to satisfy the bill than he probably would otherwise be if he continued liable to an immediate action at the suit of the holder; besides, if a holder agree to give indulgence for a certain period of time to any one of the parties to the bill, this takes away his right to call upon that party before the period expires; and not only to call on him, but on all the intermediate parties; for otherwise, if he were to oblige them to pay the bill, they would immediately resort against the very person whom the holder had indulged, which would be inconsistent with the agreement and a fraud on him." *Treatise on Bills* 442-3. The latter, which is said to be one of the reasons also, in a note to *Maltby* v. *Carstairs,* (1 *Man. & Ry.* 562), is the identical reason that the release of a joint obligor discharges his fellow. The obligee is bound to make his release good, in the only way he can, by protecting the releasee from contribution, and consequently by not exacting payment from one whom it would entitle to demand it. Now to apply Mr Chitty's reasons. In the first place, to give time to an acceptor after judgment, would certainly render him less active in endeavouring to pay than he would be, did he live in the constant fear of an execution; and, in the second, to let loose an endorser on him would be equally irreconcilable to an agreement to give him time, whether it were before judgment or after it. How would this Bank have performed its engagement to Willard, had it made Cowden take up the note and pounce upon him, as he probably would have done had he been goaded to it by an execution? It

[Manufacturers' and Mechanics' Bank v. Bank of Pennsylvania.]

would have been a palpable breach of faith; and to prevent it, for Willard's sake, we must hold that the judgment against Cowden was discharged; for to protect the one without releasing the other would be an injury to the latter by suspending his recourse to the principal, for which he must have a remedy somewhere. A judgment may perhaps fix an endorser at law, as a court of equity is a surety's peculiar forum; but that does not seem to have been the ground of the decision in *Pole* v. *Ford*; nor was there a necessity for sending the drawer into equity for an injunction, as a common-law court has an equitable jurisdiction over its writs of execution, which it exercises, for example, in sometimes setting its judgments against each other; and matter of defence subsequent to judgment may be tried on a *scire facias*. Three years after that decision came the American case of *Lenox* v. *Prout*, (3 *Wheat*. 120), in which the point was ruled in the same way; but whether on the authority of *Pole* v. *Ford* is not said; and with what accuracy, let the ground assumed for the decision determine. "The reason is obvious," said the Judge who delivered the opinion of the court, "for by the judgment they have both become principal debtors; and if the endorser suffers injury by the negligence of the judgment creditor, it is clearly his own fault, it being his *duty* to pay the money, in which case he may take under *his own direction* the judgment obtained against the maker." Take it under his direction when it has been crippled by the holder's agreement! He could no more have sued out execution on it before the expiration of the time given, than could the plaintiff who obtained it. Nor could he proceed by action on the contract of endorsement consistently with that plaintiff's engagement. The Judge was mistaken, too, in saying that, under the circumstances of the supposed case, it was the duty of the endorser to take up the paper. His engagement to pay is conditional; and it is an indisputable principle that he who waives performance of a condition, waives any right that would otherwise spring from the want of it. The same principle is applicable to a covenant, prevention by the covenantee being equivalent to performance. An endorser engages to pay if the maker do not; and the holder cannot compel him to pay, having deprived him of the chance on which he relied of being relieved from it. It may be that his engagement ceases to be conditional at the rendition of the judgment, but he is not the less a surety who may be injured by the conduct of his principal. I have called what was said in *Lenox* v. *Prout*, a dictum; and an examination of the case will justify the remark, for there was no engagement to give time. There was no more in it than a request to proceed, which, between endorser and holder, is, we have said, of no obligatory force, as well before judgment as after it. It is to be regretted that this case was inadvertently received as authority in *Bay* v. *Tallmadge*, (5 *Johns. Ch.* 315), by a chancellor whose well-earned reputation has given it currency as establishing a

rule of general equity that judgment against principal and surety extinguishes the relation between them as to every one but themselves. Such a rule has no place in the jurisprudence of Pennsylvania. It was not recognised in *The Commonwealth* v. *Miller's Administrators*, (8 *Serg. & Rawle* 452); and notwithstanding the doubt expressed by my brother ROGERS in *The Commonwealth* v. *Haas*, (16 *Serg. & Rawle* 252), it was expressly rejected in *Pott* v. *Abrahams*, (1 *Watts & Serg.* 158). The root of the error seems to consist in taking for granted that when the engagement of the endorser ceases to be conditional, he necessarily ceases to be a surety. The engagement of a surety in a bond is unconditional from the first, and his right to compel the obligee to sue would be of little avail, were the latter bound to proceed no further than judgment. The surety might pay the debt, it is true; but it has been gravely doubted whether the judgment would not be *ipso facto* discharged. He is, however, not bound to pay it before he can at least indirectly originate an action on the security, it being clear, as was held in *Wright* v. *Simpson*, (6 *Vez.* 734), that on depositing a sum sufficient to cover the expense, he may compel the creditor to do the best he can for him by collecting the debt from the principal, (1 *Story Eq.* § 327); and in that respect, equity even falls behind the civil law, which requires the principal to be sued in the first instance. In the case before us, it is unnecessary to resort to anything else than the ordinary principle, that, if the creditor impairs a security taken from the principal, he discharges him, in order to show that the judgment of the United States Bank is to be laid out of the case; and what is the state of the game between the others?

The lien of the Bank of Pennsylvania thus becomes the second piece on the board; and the objection made to it is, that the conveyance by which it was created is not a mortgage, but an assignment in trust to pay a particular creditor; and that, as it was not recorded within the period prescribed by the statute, it is consequently void. But it is clearly a mortgage limited to a trustee in fee with a power to sell; and the statute has regard, not to a conditional conveyance which may revest the property in the debtor, but to an absolute assignment to sell and pay at all events. This is too plain for illustration.

The succeeding liens stand clear of exception; but though the lien of the Manufacturers' and Mechanics' Bank is bad against them, it is good against the Bank of Pennsylvania, which had actual notice, and whose lien is good against all the rest. On the principle of *Wilcox* v. *Waln*, (10 *Serg. & Rawle* 380), the result is that the Manufacturers' and Mechanics' Bank is entitled in the first instance. The creditors subsequent to the Bank of Pennsylvania cannot come in till it has been satisfied, which cannot be till the prior lien of the Manufacturers' and Mechanics' Bank has also been satisfied; and as they are not in the field, inasmuch as

they are not to be paid, the fund being insufficient to reach them in any event, the contest which is between that Bank and the Bank of Pennsylvania is settled by what has already been said. In these money cases, we should never have done did we respect technical exceptions. We are bound to settle the law of the whole case without consulting them, and, where we can help it, without sending the case to another jury.

Judgment of the court below reversed, and judgment for the plaintiff rendered here, *non obstante veredicto.*